UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARK K. DAVIS,

               Plaintiff,

      v.

CITY OF POULSBO, a municipal
corporation; and ANDREAS PATE, in his
capacity as a police officer for the City of
Poulsbo, and as an individual,

             Defendants.

Case No.  C04-5742RJB

ORDER ON MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendants' Motion for Summary Judgment. Dkt. 15. The court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

PROCEDURAL BACKGROUND AND MOTION

On November 30, 2004, plaintiff filed this civil action, alleging that defendants City of Poulsbo and Officer Andreas Pate violated the First and Fourth Amendments of the Constitution during a stop and arrest of plaintiff on September 7, 2002. Dkt. 1. Plaintiff has also pled state law claims of assault and battery, and false arrest/false imprisonment. *Id.*

On April 14, 2005, defendants filed a motion for summary judgment, arguing that (1) defendants did not violate plaintiff's civil rights because the stop was lawful, the arrest was lawful, and Officer Pate's use of force was not excessive; (2) plaintiff has no right to verbally oppose and

challenge Officer Pate when Officer Pate had reasonable cause to stop him, a statutory right to request identification, and probable cause to arrest him; and in addition, Officer Pate did nothing to prevent plaintiff from speaking; (3) defendants did not falsely arrest or imprison plaintiff and did not commit assault/battery; (4) Officer Pate is entitled to qualified immunity; and (5) plaintiff has not pled a claim sufficient to support municipal liability on the part of the City of Poulsbo.  Dkt. 15.

In his response opposing the motion, plaintiff contends that (1) the initial detention was invalid because Officer Pate exceeded the scope of the necessary stop by asking him to return for questioning to where Mr. Plantz and Officer Henson were waiting; (2) he was arrested without probable cause because, once Officer Pate determined that no criminal activity had occurred at the marina, officers had no grounds to further detain him for questioning; (3) an officer may not use a citizen's refusal to provide identification as the basis for an arrest; (4) under Washington law, obstructing arrests based upon a detainee's refusal to disclose his name are invalid; (5) Officer Pate used unreasonable force in using pepper spray and refusing to alleviate the harmful effects of the pepper spray; (6) his First Amendment rights were violated because he was arrested for failure to give his last name; (7) the state law claims should not be dismissed; (8) Officer Pate is not entitled to qualified immunity; and (8) plaintiff's municipal liability claim should be deferred or continued to permit discovery to proceed. Dkt. 25.

In reply, defendants contend that (1) Officer Pate had probable cause to arrest plaintiff for the traffic infraction, and for his refusing to identify himself after being stopped for the traffic violation; (2) during the course of the traffic stop, plaintiff engaged in conduct that created probable cause to arrest him for more serious offenses; (3) plaintiff was arrested after he failed to identify himself when he was stopped for a traffic infraction, and not for criticizing Officer Pate or asking questions; (4) the fact that plaintiff has been convicted establishes probable cause; (5) plaintiff had no right under the Fourth Amendment to not identify himself; (6) plaintiff's authorities are inapt; (7) Officer Pate's use of force was not excessive; (8) there was no violation of plaintiff's rights under state law; (9) Officer Pate is entitled to qualified immunity; and (10) plaintiff has not complied with the requirements under Fed.R.Civ.P. 56(f) for deferring a decision on municipal liability.  Dkt. 35.

RELEVANT FACTS

On the night of September 7, 2002, the Poulsbo Police Department received a radio report of two suspicious persons in the parking lot next to the Liberty Bay Marina on Fjord Drive. Car prowls had been a recent problem at this location. The description included that the suspicious persons were riding bicycles and wearing bicycling gear.

Defendant Andreas Pate and William Henson (who is not a party) were police officers employed by the City of Poulsbo. They were dispatched to the area, where the officers observed two persons on bicycles. Both bicycles were being operated in violation of laws requiring lights on the front, and one was being operated in violation of laws requiring a red reflector on the rear. The officers drove up behind the bicyclists and activated their emergency lights. One bicyclist, David Plantz, stopped. Officer Pate stated that the other rider, who was later identified as plaintiff, continued to ride. Officer Pate told Mr. Plantz to wait there while they caught up to plaintiff and brought him back. Mr. Plantz complied. With their emergency lights still activated, the officers caught up to plaintiff.

The parties differ as to what happened next. Officer Pate stated that plaintiff looked at the officers but continued to ride. Officer Pate stated that, when he told plaintiff to stop, plaintiff slowed and Officer Pate asked him if he would ride back to his buddy because he needed to talk to them both. Officer Pate stated that plaintiff asked what he wanted and Officer Pate told him that he had committed an infraction and he needed to talk to both of them. Dkt. 17, at 2. Officer Pate stated that he again asked plaintiff to go back, but that plaintiff started to argue with him. *Id.* Officer Pate stated that he again told plaintiff to go back to where his friend was and that Officer Pate would explain. *Id.*

Plaintiff recounted this interaction differently. In contrast to Officer Pate's version of the events, plaintiff stated that, when he noticed that a police car was following him with his lights flashing, he stopped, and when Officer Pate asked him to ride back to Mr. Plantz' location, he did so. Dkt. 30, Exh. D, at 2.

Plaintiff returned to where Mr. Plantz and Officer Henson were, and Officer Pate recounted what happened, as follows:

> 6.    I explained to both that we had been called for suspicious activity and asked if they had been near the marina. Plantz explained to me that they had been, but said they were not in the

parking lot and were just talking.  Plaintiff also said they weren't doing anything.  While talking to them, I could smell a strong odor of intoxicants coming from both of them.  It was especially strong coming from plaintiff when he was talking.

7.      I asked both of them for identification.  Plantz produced his identification.  Plaintiff said he didn't have any.  I asked him what his name was and he said "Mark."  I asked him what his last name was and he said, "That's all you get, Mark."  I told him to tell me his last name or I would take him into custody until he could remember his name.  He again refused to give us [sic] last name.  I announced that "you're under arrest," stepped toward him and reached to grab his hand to take him into custody.  He resisted by pulling away.  I attempted to overcome his resistance by holding on and he pulled harder.  I then attempted to overcome his resistance by performing a straight wrist twist.  He dropped his bike and told me to let go of him.  I repeated "you're under arrest."  He then hit my hand with his free hand, knocking my hand off his arm and started running down the street.  I yelled "stop" and ran after him.

8.      After running about 50 yards, he turned around and stopped and said, "what do you want?"  I told him to get on the ground and turn away from me.  He yelled back, telling me not to touch him, and took a defensive stance towards me.  Plaintiff was approximately six feet tall and 240 pounds.  I am 5'9" tall and 210 pounds.  At this point, to protect myself and to overcome his resistance to being arrested, I sprayed him with one short burst of capstun (also called O.C. spray or pepper spray) while continuing to tell him to get on the ground.  He continued to yell at me and his fists were clenched.  I continued to tell him to get on the ground.  When he finally complied, I placed him in handcuffs.

9.      I took plaintiff to my car, where I had a bottle of water.  I rinsed his eyes and face with the water before transporting him anywhere.  I informed him that he was under arrest for obstructing, assaulting an officer and resisting arrest.  He still refused to tell me his last name or any other information about his identity.  While transporting him to the Kitsap County Jail, I rolled down the rear window to allow cool fresh air to blow across his face.  He finally disclosed his last name and date of birth to jail personnel during the booking process.

Id. at 2-3.

Plaintiff recounted this interaction as follows:

13.  Once there, Mr. Davis and I talked with Officer Pate and Officer Henson.  They commented that we did not have lights on the bikes and that that was an infraction.  Dennis explained that these were mountain bikes and that's why they did not have lights.  We were asked what we were doing that night and we explained that they were on our way to Dennis' parents' house.  We explained where we had gone in Poulsbo and that we were on our way back home.

14.  Neither officer told us that they were going to give us a ticket for not having a light on the bikes.

15.  After we explained to the officers what we had been doing that evening, Officer Pate asked us for our names and identification.  I told Officer Pate that I did not have my identification with me.

16.  Officer Pate asked me my name and I told him that my name was Mark.  He then asked me for my full name.  At this point, I thought we had been cooperative, so I asked him what was going on.

17.  Officer Pate told me, "You need to tell me your full name".  He did not tell me why.  I responded: "Mark is all you need to know.  I would like to know what's going on".

18.  Officer Pate then grabbed my arm.  I pulled away instinctively.

19.  Officer Pate did not tell me that I was under arrest.

20.  I backed away, asking what was going on.  I was getting a little bit scared because I did not understand what was going on.  As I backed away, I held my hands in the air with my palms open in a cooperative, non-threatening gesture.

21.  During this incident, I never balled up my fists, either partially or entirely.

22.  As I backed away, the officers advanced on me.  As I walked backwards, I asked Officer Pate several times what was going on.  Officer Pate did not tell me what was going on.

23.  I was scared.  I thought that I had been trying to help out and be cooperative.  It frightened me when the officer grabbed my arm.

24.  I ran approximately a hundred feet and then stopped because I realized it was stupid to be running away from the police, especially since I hadn't done anything.

25.  After I stopped, I turned around and put my hands up in the air, palms open in a gesture of submittal.

26.  Officer Pate was approximately fifteen to twenty feet behind me.  As he approached, I said, "Let's talk about this.  What's going on?"  I did not tell Officer Page [sic] not to touch me.

27.  Officer Pate advanced on me and said, "Okay, let's talk".

28.  When Officer Pate got close to me, within a foot, he pepper-sprayed me directly in the eyes, nose and mouth approximately four to five times.

Dkt. 30, Exh. D, at 2-4.

Defendants maintain that, when plaintiff finally complied with Officer Pate's direction to get on the ground, he was handcuffed and placed in the patrol car, and Officer Pate administered water to his face and eyes.  Dkt. 17, at 3.  Officer Pate stated that he informed plaintiff that he was under arrest for obstructing, assaulting an officer, and resisting arrest; and that plaintiff refused to tell him his last name or any other information about his identity.  *Id.*  Officer Pate stated that, as the officers were taking plaintiff to Kitsap County Jail, Officer Pate rolled down a rear window to allow cool, fresh air to blow across plaintiff's face.  *Id.*

Contrary to Officer Pate's version of the events, plaintiff stated that, after he was pepper sprayed, he experienced immediate, intense, excruciating pain and went to the ground; that after he was handcuffed and taken to the police car, he asked for water but was told to "think about it;" that he was denied water to wash out the pepper spray for fifteen to twenty minutes; and that, en route to the

1    jail, he held his head out the window and was unable to open his eyes until 2 a.m.  Dkt. 30, Exh. D, at

2    4-5.

3          Plaintiff was charged with obstructing a law enforcement officer.  Dkt. 18, Exh. A. The charge

4    was originally dismissed by the municipal court, but, on appeal, the Kitsap County Superior Court

5    reversed and remanded.  Dkt. 18, Exh. B.  Following remand, a trial was held and plaintiff was

6    convicted in October of 2004.  *Id.* at Exh. C and D.

7          The municipal court judge entered the following findings of fact:

8          1.  On September 7, 2002, Defendant and Dennis Plants [sic] were riding bicycles within the
           city limits of Poulsbo.

9
10         2.  Poulsbo Police Department had received a report of suspicious activity in the parking lot of
           Liberty Bay Marina.  The initial contact was to determine if Defendant and Plants had been in
           the Liberty Bay Marina parking lot.
11
12         3.  Upon contact Defendant, who had ridden ahead of Plants, was asked to return to an area
           near Plants, and did.

13         4.  Neither bicycle had a headlight as is required by law.

14         5.  The Poulsbo Police Department officer asked if Defendant and Plants had been in the area
           of the Liberty Bay Marina lot.  They indicated they had but had done nothing wrong.
15
16         6.  The Poulsbo Police officer noted the bicycles did not comply with the law (no headlights)
           and asked for identification.  Plants gave identification.  Defendant refused to give more than
           his first name, despite several requests by the Poulsbo Police officer.
17
18         7.  Defendant left the scene on foot, then stopped and was recontacted by the Poulsbo Police
           Officer.

19         8.  Defendant was arrested and charged with obstructing a law enforcement officer for his
           failure to provide his name to the officer.
20

21   Dkt. 18, Exh. C, at 1-2.

22         The municipal court concluded that (1) pursuant to RCW 46.61.021(2), whenever any person

23   is stopped for a traffic infraction, the officer may detain that person for a reasonable period of time

24   necessary to, among other things, identify the person; (2) pursuant to RCW 46.61.031(3),any person

25   requested to identify himself or herself to a law enforcement officer pursuant to an investigation of a

26   traffic infraction has a duty to, among other things, identify himself; (3) pursuant to RCW 46.61.022,

27   failure to comply with RCW 46.61.021(3) is a misdemeanor; (4) although the initial contact of the

28   Poulsbo Police Department with defendant was to determine whether he had been at the Liberty Bay

ORDER
Page - 6

Marina lot at the time of the suspicious activity, the officer had probable cause to issue an infraction for the bicycle equipment violation; (5) once the infraction was noted, regardless whether an infraction was written or not, defendant had the obligation to provide identification; (6) defendant's failure to provide his last name after several requests by Officer Pate was wilful; and (7) defendant's failure to provide his full name as required by statute wilfully hindered, delayed or obstructed Officer Pate's ability to discharge his officials duties; and (8) defendant was guilty of obstructing a law enforcement officer.  Dkt. 18, Exh. C, at 3-4.

Plaintiff stated that the municipal court conviction has been appealed and that the appeal is pending.

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the

nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

DISCUSSION

**Federal Constitutional Claims**

### 1. Claims

Plaintiff contends that Officer Pate and the City of Poulsbo violated his First Amendment right to freedom of speech; and the Fourth Amendment prohibition against unreasonable seizures, arrest without probable cause, and unreasonable force.

### 2. Standard for Stating a Claim under 42 U.S.C. § 1983

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

### 3. Qualified Immunity

Defendants in a § 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court

and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Id*.

### A.  Fourth Amendment

The Fourth Amendment to the Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment applies to the States by way of the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

*Unreasonable Seizure*

Plaintiff first claims that he was unreasonably seized in violation of the Fourth Amendment.

The constitutional right allegedly violated was the Fourth Amendment right against unreasonable seizure. Police may stop and question a person without any suspicion that he is engaged in wrongdoing so long as he feels free to disregard the police and go about his business. *Florida v. Bostick*, 111 S.Ct. 2382, 2386 (1991). If, however, police "seize" a person for a brief, investigatory stop it must be supported by reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). *See also Reid v. Georgia*, 448 U.S. 438, 440 (1980) (although not all seizures require probable cause, "any curtailment of a person's liberty by the police must be supported by at least a reasonable and articulable suspicion that the person seized is engaged in criminal activity.").

In considering the first step of Saucier's two-step qualified immunity inquiry, the court must determine whether plaintiff's Fourth Amendment right against unreasonable seizure was violated when Officer Pate drove up to plaintiff with his emergency lights on, told plaintiff to stop, and directed him to ride the bicycle back to Mr. Plantz' location; and when he detained plaintiff for questioning.

Under Washington law, "[e]very bicycle when in use during the hours of darkness...shall be equipped with a lamp on the front which shall emit a white light visible from a distance of at least five hundred feet to the front and with a red reflector on the rear...." RCW 46.61.780(1). RCW 46.61.021 gives law enforcement officers the authority to stop and detain persons for traffic infractions:

> (1) Any person requested or signaled to stop by a law enforcement officer for a traffic infraction has a duty to stop.
>
> (2) Whenever any person is stopped for a traffic infraction, the officer may detain that person for a reasonable period of time necessary to identify the person, check for outstanding warrants, check the status of the person's license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction.
>
> (3) Any person requested to identify himself or herself to a law enforcement officer pursuant to an investigation of a traffic infraction has a duty to identify himself or herself, give his or her current address, and sign an acknowledgment of receipt of the notice of infraction.

RCW 46.61.021.

Plaintiff first argues that, since Officer Pate had the authority only to detain him for the time necessary to identify him and to issue him a traffic infraction for failure to have a front headlight on his bicycle, the officer exceeded the scope of his authority when he asked plaintiff to ride the bicycle back to Mr. Plantz' location. Officer Pate had the lawful authority under state law to stop plaintiff and obtain his identification. Officer Pate requested that plaintiff return a short distance to where Officer Pate's partner–and plaintiff's companion–were waiting; concerns for officer safety would support such a decision. On the facts as alleged by plaintiff, Officer Pate did not violate plaintiff's constitutional right against unreasonable seizure was not violated by asking him to return to a close-by location for questioning.

Plaintiff next contends that Officer Pate did not have articulable and objective facts justifying detention of him for questioning. Under *Terry v. Ohio*, 392 U.S. 1, 25-26, an investigative stop is reasonable if the officer has specific and articulable facts giving rise to a reasonable suspicion that the

1  suspect has been involved in criminal activity.   Plaintiff maintains that a radio report of suspicious

2  persons at the marina was insufficient to justify a *Terry* stop, citing *State v. Ellwood*, 52 Wn.App. 70,

3  74 (1988) (a defendant's presence at midnight in a high burglary and assault area did not justify his

4  detention).   In this case, however, the police officers observed plaintiff and Mr. Plantz violating traffic

5  rules by operating their bicycles at night without lighting equipment and reflectors; they had received a

6  report of suspicious behavior in an area and at a time when car prowls were a problem; plaintiff and

7  Mr. Plantz were at or near the area of the report and the description of the persons engaged in

8  suspicious activities included that they were on bicycles and wearing bicycling gear.   There were

9  articulable and objective facts justifying detention of plaintiff for investigation.

10      In these circumstances, plaintiff's constitutional rights prohibiting unreasonable seizure under

11  the Fourth Amendment were not violated.

12      Because plaintiff's constitutional rights prohibiting unreasonable seizure were not violated, the

13  qualified immunity inquiry ends. *See Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir.

14  2002)("If no constitutional right was violated, the court need not inquire further," citing *Saucier v.*

15  *Katz*, 121 S.Ct. at 2156).   Nonetheless, even if plaintiff's constitutional right had been implicated,

16  there was no clearly established law at the time of the alleged conduct that would have prohibited

17  Officer Pate from stopping plaintiff on the basis of a traffic infraction and/or on the basis of the police

18  report, and from requesting that he return for questioning to where Mr. Plantz and Officer Henson

19  were waiting for questioning.  *See Hiibel v. Sixth Judicial Dist. Court of Nev.*, 124 S.Ct. 2451, 2458

20  (2004) ("it is well established that an officer may ask a suspect to identify himself in the course of a

21  Terry stop").   Officer Pate could have reasonably believed that his conduct was lawful and did not

22  violate plaintiff's Fourth Amendment rights against unreasonable seizure.

23      Officer Pate is entitled to qualified immunity with regard to plaintiff's claim that he was

24  unlawfully seized in violation of the Fourth Amendment.

25                          *Unlawful Arrest*

26      Plaintiff next contends that he was arrested without probable cause, in violation of the Fourth

27  Amendment.

28      The constitutional right allegedly violated was the Fourth Amendment right against arrest

1  without probable cause.  Under the Fourth Amendment, to arrest a suspect on probable cause, the

2  facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person,

3  or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed,

4  is committing or is about to commit an offense. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  In

5  evaluating alleged violations of the Fourth Amendment, the court undertakes an objective assessment

6  of an officer's actions in light of the facts and circumstances then known to the officer. *Scott v. United*

7  *States*, 436 U.S. 128, 137 (1978).

8         Police may arrest a person without a warrant if the arrest is supported by probable cause. *See*

9  *United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989).  Probable cause to arrest is a complete defense

10  to the liability of a police officer for an action under § 1983 arising out of an arrest. *Owen v. City of*

11  *Independence*, 445 U.S. 622, 637 (1980); *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir.

12  1990).  An officer has probable cause to arrest when the officer has knowledge of facts and

13  circumstances sufficient to cause a reasonable person to believe an offense has been committed. *Beck*

14  *v. Ohio*, 379 U.S. 89, 91 (1964); *Henry v. United States*, 361 U.S. 98, 102 (1959);  *Brinegar v.*

15  *United States*, 338 U.S. 160, 175 (1949).  In evaluating a custodial arrest executed by state officials,

16  federal courts must determine the reasonableness of the arrest in reference to state law governing the

17  arrest. *United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir.1993); see also *Barry v. Fowler*, 902 F.2d

18  770, 771 (9th Cir.1990) (finding that arrest without probable cause that the arrestee committed a

19  crime constitutes a violation of the Fourth Amendment).

20         Plaintiff did not identify himself when Officer Pate asked for his last name.  This was a

21  violation of Washington Law, RCW 46.61.021(3), which requires that a person being investigated for

22  a traffic infraction must identify himself or herself to a law enforcement officer when requested.  RCW

23  9A.76.020(1) (adopted by Poulsbo Municipal Code 9.60.010) makes it a gross misdemeanor "if the

24  person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her

25  official powers or duties."  A police officer may arrest a person without a warrant for committing a

26  misdemeanor when the offense is committed in the presence of the officer.  RCW 10.31.100.  Officer

27  Pate had probable cause, under Washington law, to arrest plaintiff for failing to identify himself.  In

28  these circumstances, plaintiff's Fourth Amendment rights were not violated when Officer Pate arrested

him for failing to identify himself.

Because plaintiff's constitutional rights prohibiting arrest without probable cause were not violated, the qualified immunity inquiry ends. Nonetheless, even if plaintiff's constitutional rights had been implicated in this situation, the law regarding when a police officer could arrest a person for failing to identify himself following a lawful stop for a traffic violation and/or during a *Terry* stop supported by reasonable suspicion was not clearly established in 2002, at the time of the incidents at issue in this case.

Plaintiff contends that, at the time of his arrest, it was clearly established that an officer may not use a citizen's refusal to provide identification as the basis for an arrest. A review of the case law, however, shows that the law regarding when a police officer may arrest for failure to provide identification during a *Terry* stop was anything but established at the time the incidents at issue in this case occurred.

The Supreme Court recently addressed *Terry* stop/identification issue in *Hiibel v. Sixth Judicial Dist. Court of Nev.*, *supra*. In *Hiibel*, a defendant was arrested and convicted for refusing to identify himself during a *Terry* stop in violation of Nevada's "stop and identify" statute, which required a person detained by an officer during an investigative stop to identify himself or herself. *Id.* at 2456-57. The initial stop of the defendant in *Hiibel* was based on reasonable suspicion. *Id.* at 2457. The Supreme Court held that the Nevada statute's requirement that a suspect must disclose his or her name in the course of a *Terry* stop did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.* at 2459-60. In doing so, the Supreme Court declared that obtaining a suspect's name during a *Terry* stop served important government interests: knowledge of identity could bring to light that the suspect is wanted for other offenses or that he or she has a record of violence or a mental disorder; or learning the suspect's identity may clear him or her and allow officers to concentrate their efforts elsewhere. *Id.* at 2458. The Supreme Court determined that the Nevada statute properly balanced the intrusion on an individual's Fourth Amendment interests against the promotion of legitimate government interests: "The request for identity has an immediate relation

1  to the purpose, rationale, and practical demands of a *Terry* stop. The threat of criminal sanction helps

2  ensure that the request for identity does not become a legal nullity." *Id.* at 2459.

3        Plaintiff contends that Ninth Circuit precedent, prior to the 2004 U.S. Supreme Court decision

4  in *Hiibel*, clearly established that a police officer's arrest for a person's failure to provide identification

5  violated the Fourth Amendment, citing *Carey v. Nevada Game and Control Board*, 2479 F.3d 873,

6  l881-882 (9th Cir. 2002); and *Lawson v. Kolender*, 658 F.2d 1362 (9th Cir. 1981).

7        The foundation for this Ninth Circuit line of cases is a statement in Justice White's concurring

8  opinion in *Terry v. Ohio*, 392 U.S. at 34 (and in dicta in subsequent cases citing his statement) that a

9  person detained in an investigative stop can be questioned but is not obliged to answer; answers may

10  not be compelled; and refusal to answer furnishes no basis for an arrest. *See Carey*, 279 F.3d at 881-

11  82. In *Hiibel*, the Supreme Court commented on the statement in Justice White's opinion in *Terry v.*

12  *Ohio* and on the related statements in subsequent opinions: "We do not read these statements as

13  controlling...we cannot view the dicta in *Berkemer* or Justice White's concurrence in *Terry* as

14  answering the questions whether a State can compel a suspect to disclose his name during a *Terry*

15  stop." *Hiibel v. Sixth Judicial Dist. Ct. of Nevada*, 124 S.Ct. At 2458.

16        While *Hiibel* was not decided by the U.S. Supreme Court until 2004, and the events in the case

17  before this court occurred in September of 2002, the Nevada Supreme Court decision in *Hiibel* was

18  issued December 20, 2002. *See Hiibel v. Sixth Judicial Dist. Court ex rel. County of Humboldt*, 118

19  Nev. 868, 59 P.3d 1201 (Nev. Dec 20, 2002). In that case, the Nevada Supreme Court recognized

20  that there was a split of authority over this issue in the circuit courts of appeals. *Id*. at 118 Nev. 868,

21  872-73. As of September 7, 2002, when the incidents in this case occurred, the law was not clearly

22  established that an officer who arrested a person for failing to identify himself during the course of a

23  valid *Terry* stop would violate a person's constitutional rights prohibiting arrest without probable

24  cause under the Fourth Amendment. In fact, some two years later, in *Hiibel*, the Supreme Court

25  concluded just the opposite–that an officer arresting a person under a state statute that required a

26  person to identify himself during a valid *Terry* stop did not violate the Fourth Amendment. The court

27  notes that the Supreme Court has not addressed the issue of whether a person can be arrested under a

28  state statute for failing to identify himself when the officer has probable cause to issue a traffic

1   infraction, but a request by a police officer for identification based upon such probable cause arguably

2   provides even more justification than would even a *Terry* stop, which requires only reasonable

3   suspicion.

4          At the time of the incident, it was not clearly established law that arresting plaintiff for failing

5   to identify himself after he had been detained for a traffic infraction and/or detained for questioning

6   following the police radio report in this case violated the Fourth Amendment.  Officer Pate could have

7   reasonably believed that his arrest of plaintiff did not violate plaintiff's Fourth Amendment right

8   against unlawful arrest.

9          Officer Pate is entitled to qualified immunity with regard to plaintiff's claim that he was

10  unlawfully arrested in violation of the Fourth Amendment.

11                                            *Excessive Force*

12         Plaintiff also contends that Officer Pate used excessive force in arresting him, in violation of

13  the Fourth Amendment.

14         The constitutional right allegedly violated was the Fourth Amendment right against excessive

15  force.  The use of excessive force by a law enforcement officer in effectuating an arrest states a valid

16  claim under 42 U.S.C. § 1983.  Any claim that law enforcement officials have used excessive force in

17  the course of an arrest, an investigatory stop or other seizure of a person is properly analyzed under

18  the Fourth Amendment's objective 'reasonableness' standard.  *Graham v. Connor*, 490 U.S. 386, 388

19  (1989). The 'reasonableness' inquiry in an excessive force case is an objective one: the question is

20  whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

21  confronting them, without regard to their underlying intent or motivation.  *Id*. The reasonableness of

22  defendant's actions depends on factors such as the severity of the crime at issue, whether the suspect

23  poses an immediate threat to the safety of the officers or others, and whether the suspect is actively

24  resisting arrest or attempting to evade arrest by flight.  *Id*. at 396.  The totality of the circumstances of

25  each case must be considered.  *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995); *Forrester v.*

26  *City of San Diego*, 25 F.3d 804, 806, n. 2 (9th Cir. 1994), *cert. denied* 115 S.Ct. 1104 (1995).

27         In this case, there are factual disputes that preclude the court from determining, at this point,

28  that Officer Pate is entitled to qualified immunity as to the excessive force claim.  Officer Pate claims

ORDER
Page - 15

1   that plaintiff was uncooperative and resisted the officer's attempts to arrest him, that the use of pepper

2   spray was reasonable under the circumstances, and that he attempted to minimize the painful effects of

3   the pepper spray.  Plaintiff contends that he was cooperative, that the pepper spray was unnecessary

4   because Officer Pate used it after plaintiff returned to the scene with his hands in the air, and that

5   Officer Pate did not attempt to alleviate the painful effects of the pepper spray.  The facts that are in

6   dispute preclude summary judgment, or a decision on qualified immunity, on this claim, at this time.

7            **B.  First Amendment**

8            Plaintiff contends that he had a federally-protected right, under the freedom of speech

9   provisions of the First Amendment, to verbally oppose and challenge Officer Pate's request that he

10  identify himself, and that Officer Pate violated that right.

11           The First Amendment to the Constitution provides: "Congress shall make no law respecting an

12  establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech,

13  or of the press; or the right of the people peaceably to assemble, and to petition the Government for a

14  redress of grievances."

15           In this case, Officer Pate had reasonable cause to stop plaintiff, a statutory right to request

16  identification, and probable cause to arrest him.  Plaintiff has not shown that he had a constitutional

17  right to challenge Officer Pate's request that he identify himself.  Further, even if plaintiff had such a

18  right, the law was not clearly established that the right was violated in these circumstances.  Officer

19  Pate could have reasonably believed that his arrest of plaintiff did not violate plaintiff's First

20  Amendment rights.

21           Officer Pate is entitled to qualified immunity with regard to plaintiff's claim that he was

22  unlawfully arrested in violation of the First Amendment.

23           **4.  Municipal Liability**

24           Plaintiff has stated a municipal liability claim against the City of Poulsbo related to his claims

25  under 42 U.S.C. § 1983.  In order to set forth a claim against a municipality under 42 U.S.C. § 1983, a

26  plaintiff must show that the defendant's employees or agents acted through an official custom, pattern

27  or policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity

28  ratified the unlawful conduct.  *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91

(1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991).  The municipal action must be the moving force behind the injury of which plaintiff complains.  *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).

Defendants maintain that plaintiff has not come forward with the requisite showing to establish the elements of a claim for municipal liability.  Plaintiff contends that summary judgment on municipal liability is premature, since discovery has not been completed.

By this order, plaintiff's First Amendment claim, and his Fourth Amendment claims of unreasonable seizure and unlawful arrest are dismissed.  The claims against the City of Poulsbo predicated on these claims should also be dismissed.  *See Jackson v. City of Bremerton*, 268 F.3d at 653 (Neither a municipality nor a supervisor can be held liable under § 1983 where no injury or constitutional violation has occurred).   Since plaintiff's excessive force claim remains before the court at this time, the court should permit the claim against the City of Poulsbo related to that claim to proceed.

## State Law Claims

Under 28 U.S.C. § 1367, a federal court may assume supplemental jurisdiction over all other claims that are so related to claims in the action within the original jurisdiction so that they form part of the same case or controversy.

### 1.  False Arrest/Imprisonment

A false arrest occurs when a person with actual or pretended legal authority to arrest unlawfully restrains or imprisons another person.  *Bender v. City of Seattle*, 99 Wash.2d 582, 590-91, (1983).  False imprisonment is the intentional confinement of another person unjustified under the circumstances.  *Kellogg v. State*, 94 Wash.2d 851, 856, 621 P.2d 133 (1980).  The existence of probable cause to arrest is a complete defense to an action for false arrest, false imprisonment, and malicious prosecution.  *McBride v. Walla Walla County*, 95 Wn.App. 33, 38, *review denied*, 138 Wn.2d 1015 (1999).  Probable cause for warrantless arrests exists when an officer has reasonably trustworthy information sufficient to permit a person of reasonable caution to believe that an offense

has been or is being committed. *Gurno v. Town of LaConner*, 65 Wn. App. 218, 223, *review denied*, 119 Wn.2d 1019 (1992).

In this case, as discussed above, Officer Pate had reasonable suspicion to detain plaintiff for a traffic violation under Washington law, and probable cause to arrest plaintiff under Washington law for failing to identify himself. Defendants' motion for summary judgment as to plaintiff's state law claim for unlawful arrest/false imprisonment should be granted and this claim should be dismissed.

**2. Assault and Battery**

Assault is committed when a person's actions or threats cause a victim apprehension of imminent physical violence. *St. Michelle v. Robinson*, 52 Wn.App. 309, 313 (1988). The common law definition of assault also includes unlawful touching with criminal intent or actual battery. *State v. Wilson*, 125 Wash.2d 212, 217-18 (1994). A battery is the intentional infliction of a harmful bodily contact upon another; and in order that any act may be done with the intention of bringing about a harmful contact or an apprehension thereof to a particular person, the act must be done for the purpose of causing the contact or apprehension or with knowledge on the part of the actor that it is substantially certain to be produced. *See Garratt v. Dailey*, 56 Wn.2d 197, 200 (1955).

As discussed above, the facts related to how the arrest was made are in dispute. There are material issues of fact that preclude summary judgment on plaintiff's assault/battery claim. Defendants' motion for summary judgment on plaintiff's assault/battery claim should be denied.

Therefore, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 15) is **GRANTED IN PART AND DENIED IN PART**, as follows: The motion is **GRANTED** with regard to plaintiff's claims that defendant Pate violated his First Amendment rights and his Fourth Amendment rights prohibiting unlawful seizure and unlawful arrest, and these claims are **DISMISSED** on the basis of qualified immunity. The motion is **DENIED** with regard to plaintiff's claim that Officer Pate violated plaintiff's Fourth Amendment right against use of excessive force in effecting an arrest, and this claim may proceed. The motion is **GRANTED** with regard to plaintiff's claim for municipal liability against the City of Poulsbo on plaintiff's First Amendment claim and on his Fourth Amendment claims for unlawful seizure and unlawful arrest, and these claims are **DISMISSED**. The motion is **DENIED**

1  with regard to plaintiff's claim for municipal liability against the City of Poulsbo related to plaintiff's

2  Fourth Amendment claim for excessive force in effecting an arrest, and this claim may proceed.  The

3  motion is **GRANTED** with regard to plaintiff's state law claim for unlawful arrest/false imprisonment,

4  and this claim is **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** with regard to

5  plaintiff's state law claim for assault/battery, and this claim may proceed.

6       The Clerk is directed to send uncertified copies of this Order to all counsel of record and to

7  any party appearing *pro se* at said party's last known address.

8       DATED this 23rd day of May, 2005.

9

10

11                                    Robert J. Bryan
                                      United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 19